FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
6/11/2024
JEFFREY P. COLWELL, CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

ROBERT A. HUNTSMAN and

LILY M. HUNTSMAN,

Plaintiffs, Pro Se,

v.

LIBERTY MUTUAL AUTO AND HOME SERVICES LLC,

GEICO CASUALTY COMPANY,

RELX INC.,

ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY,

AMERICAN FAMILY HOME INSURANCE COMPANY,

PROGRESSIVE CASUALTY INSURANCE COMPANY,

AUTO-OWNERS INSURANCE,

FARMERS GROUP PROPERTY AND CASUALTY INSURANCE,

NATIONWIDE INSURANCE COMPANY OF AMERICA,

ENCOMPASS INSURANCE COMPANY,

STILLWATER PROPERTY AND CASUALTY INSURANCE COMPANY, and

TRAVELERS PROPERTY CASUALTY INSURANCE COMPANY,

Defendants.

## COMPLAINT

In accordance with Fed. R. Civ. P.3, Plaintiffs Robert A. Huntsman and Lily M. Huntsman, individuals, residing in Colorado (hereafter "Plaintiffs"), appearing pro se, for their Complaint against Defendant Liberty Mutual Auto and Home Services (hereafter "Liberty Mutual"), Relx, Inc., and the other defendants identified above, file this Complaint and allege as follows:

### I. Statement of Jurisdiction

1. This is primarily a Federal Question antitrust action brought under 28 U.S.C. § 1331.

2. Plaintiff Robert A. Huntsman is a citizen of the state of Colorado.

3. Plaintiff Lily M. Huntsman is a citizen if the state of Colorado.

4. Defendant Liberty Mutual Auto and Home Services LLC is incorporated in the state of Massachusetts with its principal place of business in Massachusetts at 175 Berkeley Street, Boston, Massachusetts with agent offices throughout the United States including the state of Colorado, as well as a registered agent of record in Colorado at Corporation Service Company, 1900 W Littleton Blvd, Littleton, CO 80120.

5. Defendant Geico Casualty Company is a Nebraska company with a principal office at 5260 Western Avenue, Chevy Chase, Maryland, and a registered agent of record at Colorado at C T Corporation System, 7700 E Arapahoe Rd Ste 220, Centennial, CO 80112.

6. (Since Plaintiffs bought the homeowners policy from Defendant Geico Casualty Company who then handed it off to Defendant Liberty Mutual Auto and Home Services for claims processing, individual liability for various injurious acts may be an issue but collective liability between the two companies is not an issue.) For the purposes of this action, those two companies collectively will be referred to as "Liberty Mutual."

7. Defendant Relx Inc., formally known as Reed Elsevier, and also known as LexisNexis Risk, is incorporated in Delaware with its principal place of business at 230 Park Ave Fl 7, New York, New York, and its mailing address at 1105 N Market St Ste 501, Wilmington, Delaware with a Colorado registered agent of record at C T Corporation System, 7700 E Arapahoe Rd Ste 220, Centennial, CO 80112.

8. Defendant Allstate Fire and Casualty Insurance Company is incorporated in the state of Illinois with its principal place of business at 2275 Sanders Road North Plaza, Northbrook, Illinois with agent offices throughout the United States including in the state of Colorado, as well as a registered agent of record in Colorado at C T Corporation System, 7700 E Arapahoe Rd Ste 220, Centennial, CO 80112.

9. Defendant American Family Home Insurance Company is incorporated in the state of Florida with its principal place of business at 1301 Riverplace Blvd Ste 1500, Jacksonville, Florida with a mailing address of PO Box 5323, Cincinnati, Ohio, with agent offices throughout the United States including in the state of Colorado, as well as a registered agent n Colorado at Registered Agent Solutions, Inc., 36 South 18th Avenue, Suite D, Brighton, CO 80601.

10. Defendant Progressive Casualty Insurance Company is incorporated in

the state of Ohio with its principal place of business in Ohio at 6300 Willson Mills Road, Cleveland, Ohio with agent offices throughout the United States including in the state of Colorado, as well as a registered agent of record in Colorado at C T Corporation System, 7700 E Arapahoe Rd Ste 220, Centennial, CO 80112.

11. Defendant Auto-Owners Insurance is incorporated in the state of Michigan with its principal place of business in Michigan at 601 Anacapri Blvd, Lansing, Michigan with agent offices throughout the United States including in the state of Colorado, and delinquent business filings with the Colorado secretary of state and a registered agent of last record in Colorado at C T Corporation System, 7700 E Arapahoe Rd Ste 220, Centennial, CO 80112.

12. Defendant Farmers Group Property and Casualty Insurance Company, doing business as Foremost Insurance and Foremost Star Insurance, is a Rhode Island company with numerous offices in Colorado and no Colorado registered agent of record, with a registered agent in Rhode Island at Corporation Service Company, 222 Jefferson Boulevard, Suite 200, Warwick, RI 02888.

13. Defendant Nationwide Insurance Company of America is incorporated in the state of Ohio with its principal place of business in Ohio at One Nationwide Plaza, 1 W Nationwide Blvd., Columbus, Ohio with agent offices throughout the United States including in the state of Colorado as well as a registered agent of record in Colorado at Corporation Service Company, 1900 W Littleton Blvd, Littleton, CO 80120.

14. Defendant Encompass Insurance Company is incorporated in the state of Illinois with its principal place of business in Illinois at 3100 Sanders Road, Suite K4, Northbrook, Illinois with agent offices throughout the United States including in the state

of Colorado as well as a registered agent of record in Colorado at C T Corporation System, 7700 E Arapahoe Road, Suite 220 Centennial, CO 80112.

15. Stillwater Property and Casualty Insurance Company is incorporated in the state of New York with its principal place of business at 100 Jericho Quadrangle Ste 124, Jericho, New York with agent offices throughout the United States including in the state of Colorado as well as a registered agent of record in Colorado at Division of Insurance, 1560 Broadway, Denver, CO 80202.

16. Travelers Property Casualty Insurance Company is incorporated in the state of Connecticut with its principal place of business at 1 Tower Sq, Hartford, Connecticut, with agent offices throughout the United States including in the state of Colorado as well as a registered agent of record in Colorado at Corporation Service Company, 1900 W Littleton Blvd, Littleton, CO 80120.

## II. Jurisdiction and Venue

17. Plaintiffs bring this action pursuant to Section 2 of the Sherman Act, 15 U.S.C § 4, and Section 4 of the Clayton Act, 15 U.S.C. § 12 and thus pose a Federal Question providing appropriate subject matter jurisdiction for this court in accordance with 28 U.S.C. § 1331.

18. Venue is proper as per 28 U.S. Code § 1391(b)(2) in the District of Colorado because it is the judicial district in which a substantial part of the events or omissions that gave rise to the claim occurred, and Plaintiffs' residential property, that constitutes all the property that is the subject of the action, is located within the district.

19. Plaintiff also brings additional pendant Colorado state supplemental claims

pursuant 28 U.S.C. § 1367 to Colorado state law because the state law claims arise derive from a common nucleus of operative facts.

## III. Introduction

20. This case is about two common, but likely illegal practices performed by residential home insurers in the name of so-called "risk management[1]."

21. The first objectionable and likely illegal practice is that the insurance industry generally, and these insurance company defendants specifically, routinely and collectively gather private client property loss data, and then submit it to an industry-wide database, who then collusively share it with their competitors for the express purpose of denying homeowners new or renewed home insurance who file have filed property loss claims in the past.

22. The second objectionable and likely illegal practice is the common practice of using the mere act of filing a property loss claim itself as an indicator that the filer personally poses a higher risk for future losses than non-filer regardless of the nature of the claim. When Plaintiff sits down with an insurance broker, when the broker hits the "submit" button, whatever software they are using IMMEDIATELY rejects the application for insurance only because of file claim <u>count</u>. There is <u>no</u> human intervention, no analysis of the nature or even the amount of the claim, just an "I'm sorry, we can't help you" from the multi-company insurance broker.

23. In the present case, the Plaintiffs suffered significant loss from a severe

---

[1] Risk management for the insurance companies, not for the insured.

hailstorm that totaled both Plaintiffs automobiles and destroyed the Plaintiffs' residential roof. However, there is nothing wrongful about filing a property loss claim under these circumstances. Anyone with insurance is going to do it, and the act of filing says nothing about the Plaintiffs on a personal level[2] about their future insurance risk.

24. On information and belief, there appears to be no statutory basis for this business practice of routinely denying insurance coverage for past loss claims. Defendants apparently analogize property claim filers with financial malfeasance track by the financial banking sector. If I apply for a credit card and promise to timely pay the bill and then don't do it, I am engaging in a wrongful act, contrary to the contractual obligation to repay which is one thing, a broken contract. However, if hail damages my home or I suffer some other covered loss and file a property loss claim, that is something totally different. I am not doing anything wrong; I am not violating the terms of my contract like the delinquent borrower and I am not breaking any contractual obligation. Liberty Mutual disparaged me in a harmful by conflating me with a delinquent borrower and identifying me personally as a credit risk to its competitors by reporting my claim history to the CLUE database as a bad act. By so doing, they have interfered big time with my right to get insurance elsewhere and committed actional business interference under Colorado state law.

---

[2] If a denial was based on the nature of the damage and source of the damage, hail, insurers perhaps could perhaps reasonably deny a new policy or increase premiums for insuring a house in a higher risk hazardous hail area. The data shared in that scenario would be only <u>address information,</u> <u>not the names</u> of the policy holders. By tagging and sending Plaintiffs' names to the CLUE database, Plaintiffs do not even have the option to move to a less hazardess area of the country because the claim count will still be 3.

25. There is no exception in the law that the Plaintiffs can identify that allows insurance companies to break consumer laws and antitrust laws with impunity so they can manage their own risk[3]. They are handsomely paid to manage the homeowning consumer's risk, not their own, and, simply stated, they need to stick to lawful, consumer-friendly metrics to manage their own internal risks and cease from injuring the clients they have been retained to protect.

26. Plaintiffs have done nothing wrong here but through no fault of their own, cannot find insurance for their residential home as a June 26th deadline looms.

## IV. The Parties

27. Mr. Robert Huntsman and Ms. Lily Huntsman, Plaintiffs, are married retirees living in Aurora, Colorado.

28. Mr. Huntsman is a retired patent attorney and was a software engineer for Hewlett-Packard. Ms. Huntsman is a retired schoolteacher.

29. Plaintiffs moved to Colorado in 2017 and purchased their present home at 16036 E. Lehigh Circle, Aurora, Colorado, the property that is related to the subject matter of the claims, on June 27, 2017. The policy was purchased from Defendant Gico Casualty Company who partners with Liberty Mutual for at least claims processing. Defendants Throughout that time, the property has been insured by Defendant Liberty Mutual.

---

[3]It is noteworthy that a group of companies in the business of managing other people's risk will, without a second thought, injure their own clients in a misguided effort to manage their own risk.

30. During the seven years, Plaintiffs timely paid their monthly premiums and, in the same time period, filed two righteous[4] property loss claims. The first claim was for fire damage from an electrical fire in 2021. The second claim was filed in 2023 for hail damage from a significant hailstorm that damaged 100% of the roofs in the Plaintiffs' neighborhood.

31. To date, there has been no suggestion by anyone that these claims were improper in any way.

32. Defendant Liberty Mutual, not the Plaintiffs, filed a third animal roof damage claim related to roof replacement, which gives rise to the Plaintiff's state law negligence claim. While the Liberty Mutual inspector was inspecting the hailstorm damages, to her credit[5], she observed animal damage in the attic that need remediation before the roof was replaced and indicated that the detected damage also was a covered event and she, not the Plaintiffs, filed a third claim. The animal damage was approximately $2,000 and Plaintiffs could have and certainly would have paid for that damage out-of-pocket had Plaintiffs known that a third claim in 5 years makes a homeowner uninsurable according to the insurance defendants herein. Indeed, Liberty Mutual's silence before the hammer fell and insurance was canceled gives rise in part to the bad faith insurance claim brought against Liberty Mutual.

33. Plaintiffs contend that their claim history with Liberty Mutual is private, sensitive data that should be held in confidence, not shared with Relx, who profits by

---

[4] "Righteous" herein means "not wrongful".

[5] The inspector may get reprimanded or fired for her attempts to do the right thing for the consumer, which would be unfortunate result in the view of the Plaintiffs.

selling the Plaintiffs'data to any and all[6] willing to pay the subscription fee. Liberty Mutual and the other defendant insurance companies, and defendant Relx, however, view the Plaintiffs private data as an asset to share with competitors so that all in the industry can collude and collectively inflate premiums and decline insurance solely on the basis of individuals who file claims under the faulty premise that any homeowner that files a contractually approved property has enhanced risk for future property damage as contrasted with property owners who do not file property loss claims.

34. On information and belief, every insurance company Defendant in this action files their insured's sensitive claims data with the industry CLUE database managed by Defendant Rexl[7], a database used by virtually every single home insurance company in Colorado. Permission from the claim victim is not sought nor reported, nor is any contextual detail beyond the date and basis for the claim[8].

35. The Defendants herein do not use the data IN ANY WAY to help the claim victims, just to punish <u>and intimidate them</u> for filing contractually permissible claims.

36. The Defendants collective and collusive behavior is blatantly artificially limiting the supply of home insurance products for unlucky homeowning consumers.

---

[6] It appears every Defendant insurance company uses the CLUE database in their euphemistically named, so-called "risk management" assessment.

[7] Better known in the legal community as Lexis-Nexis.

[8] One might think that the industry could then quickly distinguish a claim for a hailstorm that damaged 100% of the roofs in a particular neighborhood, where 100% of the homeowners filed claims and had their roofs repaired, from a claim arising from homeowner exhibiting bad or negligent behavior, the former not an enhanced future risk when contrasted with the latter, as competent risk management would dictate. The insurance companies are just being lazy, incompetent, and negligent. It is much easier to count claims than to analyze them.

37. On April 22, 2024, Defendant Liberty Mutual informed Plaintiffs they were no longer going to be insured by Liberty Mutual and coverage would cease on June 26, 2024. Plaintiff's immediately sought replacement insurance from other Colorado insurers and in every case were denied coverage due to claim history reported by Liberty Mutual, and as of the writing, not even offered coverage at an increased rate for the residential home. The Plaintiffs' property damage claim history in each case was cited as the reason for denying coverage.

38. In a conversation with Rocket Mortgage, Plaintiff's were informed that adequate homeowner's insurance has to be in place at all times as a condition of the loan, and now Plaintiffs are facing a foreclosure action if insurance is not quickly found[9].

39. Defendants are leaving Plaintiffs with little choice and requiring them to rent, not buy another home[10], until they die (or at least one claim is deleted from the database.)

40. The 3 claims (as reported by the industry database) in 5 years rule (or something like it) is an informal, collusive rule[11] by the insurance companies to improve their profitability industrywide at the expense of consumers they are supposed to be

---

[9] Foreclosure aside, it is financially imperative and prudent for any homeowner to have insurance on a $650,000 home, making continued home ownership no longer viable.

[10] Since the shared claim history includes Plaintiffs names, buying a different property does not appear to be a viable option since Plaintiffs have now been inaccurately defamed as insurance bad risks.

[11] Likely not written down anywhere but implicitly understood by every homeowner's insurance company in Colorado. The fact they all purchase a CLUE database subscription and submit data to it is powerful and compelling evidence that the parties are colluding implicitly if not explicitly.

protecting, the flawed theory being that people who file property claim losses are bad insurance risks[12]. The message that is conveyed to homeowners less naive than the Plaintiffs[13] is "if you actually use your expensive, contractually allowed insurance benefits you will surely be punished for doing so."[14] This practice is becoming more well known and, of course, has a chilling effect on homeowners to file appropriate claims even when they have been paying expensive premiums for this very purpose and even when the claims are clearly covered.

41. It is noteworthy that the value to the consumer for the expensive insurance product is precisely reimbursement for a loss and yet the entire industry, including Liberty Mutual, is punishing claim filers for doing precisely what they purchased the insurance for. It is akin to automobile dealers punishing purchasers for actually driving the purchased cars. It is common insurance industry practice, but it is unethical and in violation of both Federal and state antitrust laws as the dubious practice has promulgated throughout Colorado and likely everywhere on the planet.

---

[12] In other words, people who use the widely advertised product for exactly what it is intended, and nothing else, are dubiously identified as "bad apples" by the insurance industry.

[13] To be fair Plaintiffs knew that multiple claims would likely result in punitive future insurance company action, which is one reason the third "animal damage" claim is so maddening. At the time Plaintiffs were just trying to get their roof repaired AND because the idea of filing a claim was proposed as an appropriate convenience by a Liberty Mutual adjuster, Plaintiffs did not object. Plaintiffs at a minimum should have been notified and informed that filing an additional petty claim $1100 was going to cost them far more than $1100 and make getting homeowners insurance going forward very difficult and costly if at all.

[14] It is noteworthy that the punitive consequences that befalls those who file property claims is never mentioned or hinted at in any of the massive insurance company television and print advertisements or insurance policy contracts. To the contrary, "peace of mind" is advertised, not the prospect of foreclosure.

42. Plaintiffs are desperately seeking a remedy to avoid losing their home to foreclosure and possible forced sale by June 27th. One obvious simple partial remedy would be for Liberty Mutual to be honest and recognize that the second and third claim are actually the same claim[15] and thus reduce the claim count to 2 in their database reporting[16].

43. For all these reasons the Plaintiffs seek both monetary relief and injunctive relief as identified herein below.

## Claim 1 – Violation of Sherman Antitrust Act § 2 Against All Defendants

44. The Sherman § 2 prohibits companies from combining with other companies to exercise monopoly power in a relevant market.

45. All defendant companies, by collectively maintaining and using a common, shared database (or databases) containing claim filing data from their so-called competitors, have formed an informal, unlawful cartel that spans state boundaries and allows these defendants, individually and collectively, to intimidate consumers of insurance products to not file righteous property claims. The hapless consumer cannot escape this cartel's intimidation by moving to another state and purchasing elsewhere, because the database is available to insurance companies in all 50 states.

[15] as they did in their non-renewal letter

[16] Alternatively, defendant insurance companies could change their unpublished counting rules and only count claims filed by the homeowner. The ethical course of action would be to only count claims that have an element of wrongdoing associated with the claim but, no, all claims are counted. All claims being "charged" against the insured is persuasive circumstantial that the goal is to intimidate the insured from filing ANY claims.

46. Defendant Relx expects its clients – or cartel members – to supply claims data for the economic benefit of Defendant Rexl[17] and the benefit of the cartel to increase company profits and to the detriment of intimidated.

47. The authority to distribute data by Defendant Rexl supposedly comes the federal "Fair Credit Reporting Act" which regulates credit reporting practices and allows businesses to identify consumers who may not pay their bill. Here, the Defendants misuse the system and data, by wrongfully treating homeowners who have filed righteous, non-fraudulent claims, like a borrower with a late payment. Thus,these claim filings are being used unfairly, in a derogatory manner, suggesting homeowners who file claims are "bad risks" because they use the product exactly for its intended purpose[18]. By collectively eliminating policies from homeowners who file claims, they have unlawfully collectively reduced the supply of insurance products, and are left with a lucrative pool of non-filing clients who know what is expected of them going forward – DON'T FILE PROPERTY DAMAGE CLAIMS!!

48. All defendants are benefiting from this illegal scheme to the detriment of consumers in general and the Plaintiff's in particular.

49. All defendants are contributing to the deplorable misuse of the Relx database by releasing clients private data, and using the database as an informal "hit list".

---

[17] Defendant Rexl is being unjustly enriched by selling data rightfully belonging to the homeowner and not compensating homeowners for the data use.

[18] It is noteworthy that a late or non-payment violates a contract, whereas filing a claim is exercising a paid-for contract right, so it is unfair to treat one like the other.

50. For remedy, Plaintiffs seek:

(1) injunctive relief of permanently removing all their personal data from any claim database, including the Clue database,

(2) a Court Order declaring the practice of collecting and disseminating property damage data under the FCRA to be unlawful,

(3) a declaration that property claims data is confidential data, not for dissemination without written permission of the homeowner,

(4) monetary damages as assessed by the Court against each of the Defendants. In as much as these kinds of damages are difficult to assess, Plaintiffs suggest that the home value of $650,000 be assessed as actual monetary damages against each Defendant because that is the amount put at risk by the Defendant's unlawful actions.

(5) Trebling of monetary damages for antitrust violations as specified in the Code,

(6) Costs and attorneys' fees.

## Claim 2 – Violation of Clayton Antitrust Act § 4 Against All Defendants

The conduct and remedies alleged for Claim 2 are the same conduct and remedies identified in Claim 1 for all defendants. § 4 of the Clayton Act specifically authorizes private actions and the remedies identified above in Claim 1. Thus, all relevant paragraphs of Claim 1, including the remedies, are herein included by reference, to be applied to Claim 2.

## Claim 3 – Violation of 2023 Colorado Antitrust Act Against All Defendants

The conduct and remedies alleged for Claim 3 of are the same conduct and remedies identified in Claim 1 for all defendants. The 2023 Colorado Antitrust Act provides for private actions by parties injured in Colorado. Thus all relevant paragraphs of Claim 1, including the remedies, are herein included by reference, to be applied to Claim 3.

## Claim 4 – Negligence Against Defendant Liberty Mutual

51. Defendant Liberty Mutual has the duty to protect the pecuniary interests of its insured.

52. Defendant Liberty Mutual breached that duty when its agent filed a third claim for animal damages, and by (a) not advising the Plaintiffs of the severe negative consequences of the claim, and by (b) causing the claim to be filed; and by (c) submitted the details of the claim to the CLUE database.

53. Plaintiffs were injured, suffering including non-economic distress injury and inconvenience as well as economic damages, when Liberty Mutual declined to renew its policy based in part on the improperly filed claim.

54. For remedy, Plaintiffs ask the Court: (1) for a Court Order requiring Liberty Mutual to immediately file paperwork with Defendant Rexl to remove the claim 3 animal damage from the CLUE database; (2) a Court Order requiring Liberty Mutual to re-review its decision to terminate Plaintiff's insurance with the correct claim count of 2 claims, not 3; (3) for monetary damages after an accounting in an amount determined

by the Court[19]; (4) for costs and fees; (5) for attorneys fees.

## Claim 5 –Insurance Bad Faith and Breach of Common Law Fiduciary Duty Against Defendant Liberty Mutual

55. To its credit, Defendant Liberty Mutual handled the claims themselves fairly, courteously, and promptly.

56. The bad faith alleged here is based on Liberty Mutual failing to disclose the so-called "3 Claims in 5 Year" rule to the Plaintiffs[20]. It is noteworthy that Liberty Mutual reported 3 separate claims to the CLUE Database. but apparently combined the hail damage claim with the animal claim as a single "property loss" claim in its non-renewal letter to Plaintiffs. Why Liberty Mutual reported three claims externally and two claims internally is inexplicable[21] and unfortunately proved exceedingly injurious to Plaintiffs in their failed attempts to secure suitable insurance elsewhere. As a matter of insurance good faith, Liberty Mutual should not have arbitrarily inflated the claim history to the detriment of the Plaintiffs, whom Liberty Mutual could obviously foresee would be attempting to secure insurance elsewhere. The reason could be vindicative but unknowable at this pre-discovery stage of litigation.

---

[19] The Plaintiff's suggest that $650,000 is a fair amount, reflecting the properly value being put at risk by Liberty Mutual's misconduct.

[20] Liberty Mutual likely does not disclose the rule to its insured because it is such an embarrassingly bad and unfair rule. Liberty Mutual will likely assert there is no such rule and in fact, combined two claims into a single "property loss" claim in its non-renewal letter. The Plaintiffs assert that discovery will be required to determine if there is such a rule by identifier other policy holders also not renewed for file claim reasons.

[21] One possibly is the drafter of the termination notice also recognized there were not three claim and correctly observed that the third claim was really just a minor adjustment to the hail damage claim and was not willing to state that there were indeed three claims on the record. Unfortunately whoever reported to the CLUE database reported three, not two, which clearly made a difference to other prospective insurers.

57. Liberty Mutual also engaged in bad faith by participating in the scheme alleged in Claim 1 to intimidate and punish its insured for filing contractually appropriate property damage claims. There should be zero negative consequences from one's own insurance company for filing legitimate, non-fraudulent, non-inflated, property claims. Liberty Mutual has failed miserably by deceptively advertising how nice and benevolent they are in their television commercials and then punishing their insured for filing claims. One might ask: If not to cover the insured for unforeseen property losses, what exactly do insurance companies think the premiums are for?

58. It is noteworthy that the two legitimate claims were roughly $20,000 each, a significant amount. However, this year's premium was over $10,000. Plaintiffs have been insured by Liberty Mutual for seven years. Seven years of premiums at $10,000/year would easily cover the Plaintiff's claims without even touching premiums paid by others. The practice of using filed claims as a reason to cancel policies is, shall we say, dubious at best, and really underscores the real reason they are doing it: to intimidate claim filing.

59. Colorado recognizes the common law fiduciary duty – not to be confused with fiduciary duty as used in banking and securities. This duty broadly requires that a fiduciary in certain relationships must act for the benefit of the other party on all matters within the scope of their relationship.

60. Terminating a policy for avoidable reasons not clearly spelled out during the seven-year insured relationship is disappointing and actionable under Colorado law. Bluntly stated, insured people ought to be assured their own insurance company is not going to stab them in the back for exercising contractual rights.

61. For remedies for this claim, Plaintiffs request the same remedies identified against Liberty Mutual in Claim 4 above.

## Claim 6 - Disparagement For Treating A Filed Property Loss Claim Like A Non-Payment of an Obligation

62. As discussed in the antitrust claims for relief above, both Liberty Mutual and Rexl are treating Plaintiffs' actions of filing property loss claims as a bad thing, and thus by implicitly disparaging Plaintiffs as bad insurance risks in the Clue database contingent solely on the fact they filed property claims.

63. There is no question that the sole purpose of the CLUE database is to provide data to insurance companies to help them identify less desirable clients. The data is being used 100% to the detriment of the properly owners and 100% to the perceived but erroneous benefit of the insurance companies.

64. Plaintiffs herein allege they are not enhanced risks for insurance purposes, but have so been labeled by Liberty Mutual when it provided the data to Rexl and by Rexl when it provides the data for a fee to its subscribers. The insurance companies are not subscribing because they want to identify "good" people, they are using to identify "bad" people so they can avoid selling insurance to them.

65. Plaintiffs have been injured by being wrongfully disparaged as bad insurance risks and now unable to purchase insurance at the rate others are paying (or at any rate at this writing).

66. For remedies for this claim, Plaintiffs request the same remedies identified against defendant Liberty Mutual in Claim 4 above, and for the remedies against defendant Rexl identified in claim 1 above.

## Claim 7 - Unjust Enrichment by Defendant Rexl for Selling Data Rightfully Belonger to the Plaintiffs Without Compensating the Plaintiffs

67. As discussed above, the data in Rexl's CLUE database rightfully belongs, in whole or at least in part, to the hapless homeowners like the Plaintiff whose personal and private misfortune is precisely the lucrative data being sold by Rexl subscribers for a fee. Plaintiffs' are entitled to all or part of the collected proceeds of the data sale and distribution. Rexl is unjustly enriched. Such fees already collected should be fairly shared with the homeowners whose tragedies are being consolidated into data and then being unfairly economically exploited by Rexl.

68. For a remedy, Plaintiffs ask for an accounting of Rexl's data subscription and sales fees and an apportionment by the Court to the Plaintiffs.

## Claim 8 - Tortous Interference With Prospectuve Business Advantage by Defendants Liberty Mutual and Rexl

69. The purposeful action of Liberty Mutual supplying Plaintiffs claim data to the CLUE database, and the act of Rexl of distributing that data to Liberty Mutual competitors for money, clearly is dissuading competitive companies from insuring Plaintiffs. But for the shared private data, Plaintiffs would have easily obtained replacement insurance. If Liberty Mutual does not want Plaintiffs business that is Liberty Mutual's decision, but it is not their place to dissuade others, especially competitors, from doing business with the Plaintiffs. The conduct of these defendants is a clear and blatant violation of Colorado business interference law.

70. For a remedy, Plaintiffs ask for $10,000 in monetary damages from each of these two defendants.

## V. Prayer for Relief

71. For all these reasons, Plaintiffs pray for the injunctive and monetary relief identified in each claim above for each Plaintiff.

72. A jury trial is demanded.

DATED: Aurora, Colorado this 11th day of June, 2024

Plaintiff, Pro Se

Plaintiff, Pro Se